

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA T. MORGAN,

        Plaintiff,

                      Case No. 13-14809

v.

                      Paul D. Borman
                      United States District Judge

ZIEGER HEALTH CARE CORP. and
BARBARA PALMER,

        Defendants.

_____/

OPINION AND ORDER
DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 45) AND
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 50)

Before the Court is Defendants Zieger Health Care Corporation (d/b/a Botsford Health Care) and Barbara Palmer's Motion for Summary Judgment (ECF No. 45). Also before the Court is Plaintiff Deborah Morgan's (partial) Motion for Summary Judgment (ECF No. 50). A hearing on both these matters was held on December 23, 2014.

Plaintiff filed her complaint in state court on October 25, 2013 and it was removed to this Court by Defendants on November 21, 2014. (ECF No. 1). Plaintiff's one count complaint alleges Defendants violated the Fair Labor Standards Act, 29 U.S.C. § 207, *et seq.*, by wrongly classifying her as an administratively exempt employee and failing to pay her overtime.

For the following reasons, the Court DENIES Defendants' Motion for Summary Judgment and DENIES Plaintiff's Motion for Partial Summary Judgment because genuine issues of material fact exist as to whether Plaintiff's primary duty involved the exercise of discretion and independent judgment with respect to matters of significance.

I. BACKGROUND

A.    Plaintiff's Position and Employment History

Plaintiff was employed by Defendant Zieger Health Care Corporation ("Botsford") from

1998 until August 2013 as a "Pension Specialist". (Defs.' Ex. 1, Job Description; Ex. 2,

Resume; Ex. 3, Morgan Dep. at 30; Morgan Aff. ¶¶ 1-2).[1]  Plaintiff handled the "day-to-day

administration" of the five Botsford Pension Plans: (1) the Defined Benefit Plan ("DBP"); (2)

Defined Contribution Plan/401(a) ("DCP/401(a)"); (3) the 457(b) Retirement Plan; (4) the 403(b)

Retirement Plan; and (5) the Executive Deferred Compensation Plan ("EDC") (collectively "the

Plans").[2]  (Ex. 1, Job Description; Ex. 2, Resume; Morgan Dep. at 30-31, 41; Morgan Aff. ¶ 10,

Exs. F1-F4).

Plaintiff has a high school education and had received her paralegal certificate prior to

being hired by Botsford.  (Ex. 2, Resume; Morgan Aff. ¶ 8).  She also had extensive experience

with pension plans prior to being hired at Botsford.  (Morgan Aff. 3, Ex. 3 prior resume).  While

employed by Botsford, Plaintiff was not a supervisor, an administrator, or part of management.

(Ex. 2, Job Description; Morgan Aff. ¶ 3, Ex. 2).  Plaintiff was also not on the executive team,

the finance team, or the Retirement Committee, and her position was not a management position.

(Ex. 5, Palmer Dep. at 126, 158; Morgan Aff. ¶ 5).  But, Plaintiff was the only Pension Specialist

---

[1] For ease of reference, unless specified the exhibits referenced refer to those attached to Defendants' motion for summary judgment (ECF No. 45). Otherwise, the location of the exhibit shall be noted (*i.e.* Pl.'s Resp., Pl.'s Mot., Defs'. Reply). Further, Plaintiff has attached her own affidavit to her motion for summary judgment which in turn has multiple exhibits (ECF No. 50, Pl.s' Mot., Ex. A, Morgan Aff.). When referring to this affidavit, the Court shall cite "Pl.'s Aff." and the corresponding exhibit number where appropriate to avoid any undue confusion.

[2] Each Plan, except for the 457(b) Plan, was an ERISA qualified Plan.

2

employed by Botsford. (Morgan Dep. at 41). As Pension Specialist, Plaintiff reported directly to

Defendant Barbara Palmer, the Vice President of Human Resources and the Plan Administrator.

(Ex. 4, Palmer Aff. ¶ 4; Morgan Aff. ¶ 4). Plaintiff did not have any administrative staff under

her supervision or tasked to help her with her duties. Plaintiff controlled her own schedule and

had "minimum supervision" from Defendant Palmer. (Morgan Dep. at 89:25, 90). Plaintiff

testified that her job duties were "of importance" to Botsford. (Morgan Dep. at 109:12-14).

 In July 2013, Plaintiff was given two weeks notice that her position would be made part-

time and she could "accept the employment status change or her last day would be July 31,

2013." (Pl.s' Resp., Ex. 14). Plaintiff declined to accept the employment change and her

employment was terminated effective August 3, 2013. (Morgan Aff., Ex. 1, Employee

Summary). At the time of her termination and after fifteen years as a Pension Specialist, Plaintiff

was paid a salary of $56,201.60 annually. (Morgan Aff. ¶ 6, Ex. 2).

B. The Plans

 Plaintiff was responsible for administering the five Botsford Plans on a day-to-day basis.

Each Plan had its own Plan Documents that contained requirements and procedures regarding

eligibility, vesting requirements, normal retirement age, early age, and disability. (Ex. 5, Palmer

Dep. at 57-58). Each Plan, save the EDC, was adopted in accordance with ERISA's

requirements for qualified plans. (*See* Pl.'s Br., Ex. F1-F4). In administering Botsford's five

Plans, Plaintiff used and followed the Plan Documents and "other resource material". (Palmer

Dep. at 59). Plaintiff did not have the authority to change the Plan requirements. (*Id.* at 74; Ex.

6, Doxtader Dep. at 24; Ex. 7 Parcella Dep. at 33; Morgan Dep. at 42-46). Plaintiff testified that

she "had no responsibility for changing the policy or provisions or anything of that nature. My

3

job was to explain the document and share the information and let people know what could or could not be done with regard to what was stated in the plan document." (Morgan Dep. at 46:1-6).

In administration of the Plans, Botsford also employed "Vendors" who provided legal counsel, consulting services, and plan administration services. These Vendors, included: Deloitte and Touche; Towers Watson; Transamerica Retirement Solutions, previously known as Diversified, Wells Fargo (as trustee), and Burns Investments. (Palmer Dep. at 81, 115; Morgan Aff. ¶¶ 21-22; Pl.'s Br., Ex. H, Service Agreements). In addition to Plaintiff as a Pension Specialist, Botsford also relied upon the Board of Directors, the "Defined Compensation Benefits and Pension Committee" (also referred to as the Retirement Committee), the Finance Committee, Defendant Palmer (as official Administrator and Vice President of Human Resources), Regina Doxtader (Vice President and Chief Financial Officer), and Dianne Parcella (Director of Finance, Accounting and Payroll) in its administration of the Plans. (Morgan Aff. ¶ 20; Palmer Dep. at 74-76 (describing how a Plan could be amended).

C.     Plaintiff's Primary Job Duties

It is undisputed that Plaintiff was responsible for the day-to-day administration of Botsford's five Plans. However, exactly what Plaintiff's primary day-to-day duties were while employed by Botsford and the level of discretion and independent judgment are disputed. Plaintiff sets forth in her response brief and Motion for Partial Summary Judgment a description of her "primary duties" that she performed daily as a Pension Specialist while employed at Botsford. (Pl.'s Resp. 5-8; Pl.'s Mot. 5-10). Plaintiff has supported her argument with an extremely detailed affidavit which sets forth each of her "primary duties" as well as what each of

4

those duties entailed.[3]  (Morgan Aff. ¶¶ 59-60).  Plaintiff also testified in her deposition

regarding certain duties as set forth in the Pension Specialist job description (authored in 2005)

which were also primary duties and that her resume was an accurate reflection of her professional

———————————————————

[3] Defendants briefly argue that Plaintiff's affidavit should be disregarded because it is an attempt to create material issues of fact where none previously existed.  (Defs.' Resp. at 11).  Defendants rely upon the rule that "a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts [her] earlier deposition testimony."  *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 588 (6th Cir. 2009) (quoting *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997)).  Defendants, however, fail to point to any specific contradictions in fact between Plaintiff's deposition and her affidavit.  This inability to point to any inconsistencies blunts Defendants' argument that the affidavit is merely an attempt to create a sham material fact.  Further, Plaintiff argued at oral argument that the affidavit was needed to expand upon her deposition testimony because she was not in possession of all of Defendants' discovery, including certain documents that would allow her to estimate the overtime she worked.  (Pl.'s Aff. Ex. 11).
    To the extent the Job Description and her Resume appear to be out of date and list duties that were not within the purview of Plaintiff during the pertinent time period or were never part of her job description, those facts are borne out by other Botsford employee's testimony.  (*See* Palmer Dep. at 47-48 (Learning center was closed and transferred to human resources; Zieger Retirement club ended; Ex 6, Doxtader Dep. at 50, 62 (Plaintiff was not involved in the creation of Plan Summary descriptions); Seybert Dep. at 30 (also noting that the Learning center was closed)).  However, while Plaintiff did initially testify generally that her resume was accurate, her later more specific testimony during the deposition actually contradicts her initial general assertion.  *See i.e.*, Morgan Dep. at 121-22 (testifying that year end reports or audits were not "primary" duties); 128-29; 137 (explaining role with QDROs in which anything that did not mirror the plan would be referred to Towers Watson).  Therefore, read as a whole, Plaintiff's deposition testimony was not consistent in providing that her resume was accurate.
    Plaintiff's long affidavit also does not set forth any new job duty that was not listed in the Job Description or Resume, nor is her detailed explanation of "primary duties" in her affidavit at odds with the Job Description or Resume.  Indeed, Defendants do not attack Plaintiff's list of her primary duties -- rather, Defendants argue that her initial testimony that the Resume was accurate is an admission that the resume and job description *exclusively* set forth her job duties.  Significantly, Defendants' own motion focuses on Plaintiff's involvement in specific projects and emails rather than the general duties as explained by Plaintiff in her affidavit and set forth in her resume.
    Given the internal inconsistencies in her testimony regarding whether the general duties set forth in her resume were accurate and the failure of Defendants to set forth (and the Court's inability to find) a factual inconsistency between Plaintiff's testimony and her affidavit, the Court will not strike the Plaintiff's Affidavit.

experience. (Morgan Dep. 30-44 (agreeing in the accuracy of paragraphs 1 through 6 of the Job

Description); Morgan Dep. at 49 (agreeing in the truthfulness of her resume); *but see* Morgan

Dep. at 124-125 (explaining that monitoring disability applications was not a primary duty); 128-

29 (clarifying that she assisted with "plan design" only by helping with the materials that were

distributed to participants and "the way the website looked"); Ex. 8, Seybert Dep. at 30

(testifying the Job Description was created in 2005)). Plaintiff provides in her affidavit that

neither the 2005 Job Description nor her Resume (which incorporated the identical language) set

forth an exhaustive list of her specific day to day job duties or their frequency. (Morgan Aff. ¶

57).

Viewing the record in a light most favorable to Plaintiff, the Court summarizes Plaintiff's

primary job duties below.

### 1. Enrollment

Plaintiff provides that one of her primary duties in administering the Plans was meeting

with employees, providing them with materials regarding the Plans, explaining the requirements

of the Plans, demonstrating the retirement website, entered the data from the enrollment forms

into the computer. (Morgan Aff. ¶ 60 (b); *see also* Job Description ¶¶ 4-6).

### 2. Retirement/Death Processing

Plaintiff attests that she spent the majority of her time (at least 40%) meeting with

participants regarding the DBP. (Morgan Aff. ¶ 60(c)). Duties relating to retirement and death

processing included two face-to-face meetings with each participant, or the participant's

beneficiary in the case of a death, which included an initial meeting and a final retirement

meeting. (Morgan Aff. ¶ 60(c)). Plaintiff also reviewed Plan requirements with the participants,

6

provide "Retirement Kits" as prepared by the Vendors to the participants ( Pl.'s Br., Ex. I,

Morgan Aff., Ex. 9), answered questions regarding the process and health care options, discussed

the timing regarding notification to their managers of his or her departure, and the validation of

eligibility requirements under the Plan criteria. (Morgan Aff. ¶ 60(c), *see also* Job Description,

at ¶¶ 5-6). Plaintiff calculated an estimate of a participant's benefits, helped participants fill out

the required forms and then entered data into the computer system to reflect the participant's

elections. (*Id.*, *see also* Job Description, at ¶¶ 5-6). Plaintiff then made copies of all pertinent

documents. Plaintiff attests that the retirement meetings were scheduled almost every day and

would last an average of 1-2 hours per person which is borne out by her daily calendar. (Ex. 75,

Daily Calendar; Morgan Aff. 60(c)).

   3. Answering Questions and Providing Information regarding the Plans

   Plaintiff was also tasked with answering questions and providing information regarding

the Plans from participants, beneficiaries, Vendors, or other Botsford staff. (Morgan Aff. at ¶

60(d); Morgan Dep. at 136:18-22, agreeing that she "assist and accommodate employees via

training, education, information, guidance, and customer service"). This included providing

information to employees and management regarding any changes to the Plans and required

notices. (*Id.*, Job Description ¶¶ 2, 5).

   4. Form Collection, Distribution and Submission

   Botsford's Vendors would supply Plaintiff with Retirement Kits, Death Kits, Election

Kits and other forms and materials. (Morgan Aff. ¶ 60(e); Morgan Aff., Ex. 9, 24). Plaintiff

supplied these information kits to participants and also "personalized" the forms with Botsford's

logo. Plaintiff was also in charge of "proof reading" these kits and making sure they were

understandable. (*Id.*, Exs. 9, 24; Job Description ¶¶ 4, 5).

    5. <u>Validation of Eligibility</u>

    Plaintiff was the indisputable point person regarding eligibility of participants under the Plans, which involved validating that the Plan requirements were met, *i.e.*, age, salary amount, and death. (Morgan Aff. ¶ 60(f); Job Description ¶ 16). Regina Doxtader, Vice President and Chief Financial Officer, explained that (in regards to the EDC) Plaintiff "had the ability to determine pursuant to the plan what those requirements were and make that decision about their eligibility associated with the plan and the responsibility to put it into the system as far as they were eligible, the deductions would start happening ...". (Doxtader Dep. at 24:14-19).

    6. <u>Processing Disbursement</u>

    Plaintiff also processed disbursements for the DBP which included collecting the required form, entering the data (the elections) into Wells Fargo's retirement portal system, which would in turn trigger the disbursement from Wells Fargo. (Morgan Aff. ¶ 60(g); Palmer Dep. at 128-29). To this end, Defendant Palmer testified that Plaintiff had the authority to "commence a benefit" but noted that to commence a benefit Plaintiff "had to follow the guidelines of the plan or the requirements of the plan." (Palmer Dep. at 82:15-16, 82:20-22).

    7. <u>Processing Transactions</u>

    As to the DBP only, Plaintiff approved proposed Qualified Domestic Relations Orders ("QDROs") in accordance with the criteria set forth in a 2001 Letter generated by Watson Wyatt (now known as Towers Watson). (Morgan Aff. ¶ 60(h); Morgan Aff, Ex. 16, 2001 Letter; Morgan Dep. at 140, agreeing that determining whether the QDRO was compliant was a primary duty). When a QDRO "did not mirror the plan document", however, Plaintiff would "go to

Towers." (Morgan Dep. at 137:13-14). Plaintiff explained that her determination of whether the QDRO should be approved was not "a judgment call" but merely an assessment of referring to the Plan requirements. (*Id.* at 139).

Plaintiff provided in her affidavit that she did not process loans, withdrawals, or rollovers with respect to Botsford's DCP401(a), 403(b) or 457(b) Plans as Transamerica/Diversified was responsible for that function. (Morgan Aff. ¶ 60(h)). However, Plaintiff was responsible for approving or verifying information in the course of approving rollovers, loans, and hardship withdrawals for employees in regards to non-Botsford sponsored Plans, *i.e.* MetLife Plans. (*Id.*). Plaintiff signed as "authorized representative" or "Plan Administrator" on these request forms, certifying termination dates (Morgan Aff., Ex. 17 at D1186); certifying that the retirement date was accurate (Morgan Aff., Ex. 17, at D1263); or that the document provided the correct surviving spouse Botsford had on record (Ex. 66, Survivor Benefits Request form; Morgan Dep. at 181). Plaintiff attempts to minimize her role in these transactions explaining that she was only certifying discrete information that was verifiable in Botsford's personnel records. However, it is undisputed that she signed as "authorized representative" and some of the forms provided that her signature had the affect of certifying that the "transfer request" was proper under the plan rules. (*See i.e.*, Ex. 68, 457(b) Transfer request; Ex. 66, certifying that the information was correct and that "claimant's transaction is permissible under the plan.").

8. Communications regarding Plans including Legal Notices

Plaintiff was responsible for all "communication vehicles" as it related to the Plans. (Job Description, ¶ 5). This included mailings, notifications, distributions, as well as holding educational meetings regarding the Plans. (*Id.*). Additionally, Plaintiff was tasked with

9

explaining the Plans and their requirements to new hires at orientations. (*Id.*; Morgan Aff. ¶¶ 59-60).

Plaintiff was also responsible for how certain legal notices were sent to participants. (Ex. 41, email regarding Plaintiff's election to send a notice via email). "It was [Plaintiff's] independent discretion and judgment with respect to *how* to post these notices, not *if* she was going to post them." (Doxtader Dep. at 148:25-149:1 (emphasis added)). Plaintiff noted that she was responsible for proof-reading for typos and clarity but Botsford's Vendors were responsible for creating the substantive content of the forms. (Morgan Aff. ¶ 60, Morgan Aff., Ex. 18 10/28/11 email regarding the editing of a Towers Watson notice template).

9. Record-keeping

Plaintiff was charged with maintaining physical copies of all the Plan documents, the resource materials, and required demographic records. (Morgan Aff. ¶ 60(n); Job Description ¶ 4). Plaintiff also tracked retirement activity for each year in spreadsheets which were provided to Vendors, the Board and used during audits. (*Id.*; Morgan Aff., Ex. 12, spreadsheets).

10. Calculation of Retirement Benefits

As described ancillary to other primary duties above, Plaintiff was responsible for calculating retirement benefits for participants. During 2012-2013, Plaintiff utilized the EePoint Software system such that Plaintiff would input a name and social security number, choose the participant, input data regarding the election date, the estimated retirement date, marital status and spouse date of birth. (Morgan Aff. ¶ 60(m)). Prior to the EePoint System, Botsford had an a retirement benefit computer system that broke down in 2010. (Ex. 13; Morgan Aff. ¶ 61(b)). Because the system no longer worked, Plaintiff would use the information in the "old system"

10

and manually calculate the retirement benefits based on the calculation provided in the Plan documents. (Morgan Aff. ¶¶ 60(m), 61(b)). Plaintiff testified at her deposition that "retirement calculations had always been automated. ... When the system broke down for two years, I calculated those pensions manually and then the eepoint system came on board." (Morgan Dep. at 284:17-21).

D.      Projects and Non-Primary Duties

        1. Audits

        Every year there was an audit of the Plans by Plante Moran. (Morgan Aff. ¶ 60; Ex. 4, Palmer Aff. ¶ 9). There was also a non-pension related AOA accreditation audit that was held every three years in addition to the surprise audit by the Department of Labor in 2013. (Morgan Aff. ¶ 61). Plaintiff was the liaison between Botsford and Plante Moran (or the Department of Labor as it were) in accomplishing these audits. (Ex. 4; Palmer Aff. ¶ 9). Plaintiff provided the auditors with any information that they sought and responded to any of their questions. (Palmer Dep. at 130; Parcella Dep. at 23 (testifying that Morgan was in charge of collecting the information for the DOL audit); Doxtader Dep. at 63, 66 (describing Plaintiff's involvement with the audits as "pulling documents" and verifying if there had been changes in the Plans or enrollment)). It is undisputed that Plaintiff did not perform the audit, Plaintiff did not define the scope of the audit, and Plaintiff did not make the decision to hire Plante Moran to perform the audit. (Palmer Dep. at 130-31; Parcella Dep. at 36).

        2. Invoice Approval/Confirmation

        Defendants contend, and Plaintiff disputes, that Vendor invoice approval was one of her "primary duties." It is clear from the record that Plaintiff was tasked with "approving" or

11

confirming invoices from Vendors (specifically Towers Watson and Diversified/Transamerica) relating to their services regarding the Plans. (Morgan Dep. 127; Job Description at ¶ 14; *see* Ex. 69, Invoices; Morgan Aff., Ex. 22, Invoices). Palmer described Plaintiff's role as this: "She was approving that the work had been done, may it be complete or partial. She was also reviewing some of the costs for the service to be done. ... If that cost was exorbitant for one calculation, say on average it may be $700, if that cost came in at $2,000 Ms. Morgan would raise a concern." (Palmer Dep. at 86:15-17, 86:24-90:1; Parcella Dep. at 100, describing Plaintiff's function as verifying that these expenses "indeed took place").

When Plaintiff did not know whether an expense had been incurred or a service rendered she would refer the invoice to the appropriate person. (Morgan Aff. ¶ 61(a); *see i.e.*, Ex. 69 at D1011-14, Invoice sent to Plaintiff, approved with Palmer's signature and including exhibits with line items that reference a "contact" person for each charge including Doxtader, Palmer or Plaintiff; and at D0996-0999, Invoice sent to Plaintiff with note asking whether Plaintiff had "approve/process" the invoices, with attached line items approved by Parcella, Doxtader and Plaintiff).

After receiving "approval" from Plaintiff, Defendant Palmer would "take that approval and then sign off in order for accounts payable to render payment to the vendor." (*Id.* at 85). Plaintiff was also delegated the authority to approve payment for a period of time when Defendant Palmer was on medical leave. (*Id.*; Morgan Aff. ¶ 61(a)). Plaintiff did not, however, negotiate the fees being charged by the Vendors. (Morgan Aff. ¶ 61(a)).

3. EePoint System Project

In 2010, a power outage damaged Botsford's then computer program that supported the

12

calculation of retirement benefits for the DBP. (Ex. 13; Morgan Aff. ¶ 61(b)). Plaintiff

communicated with Botsford's IT department and the company that created the program, Wyatt

Watson (also known as Towers Watson). (*Id.*). As a result of the program being unusable,

Plaintiff began making the calculations manually. (*Id.*). Plaintiff requested recommendations

and quotes for a new program from Towers Watson and sent the information to Palmer. (*Id.*;

Morgan Aff. ¶ 61(b)). Palmer testified that it was a "collective" decision by her and Plaintiff to

choose the Eepoint System and decline the self-service option of the program. (Palmer Dep. at

176-77). However, it does not appear that Plaintiff was involved with the negotiation of the fees

to be charged or the price of the system. (Pl.'s Resp. Ex. 2, 1/5/2011 email indicating Palmer

alone met with Towers Watson and negotiated a lower price).

After the "collective" decision was made to chose the Eepoint System, Plaintiff testified

as to her role in the project: "once they implemented the system, then they would provide us with

samples of calculations, and so my role was to check and make sure that they were calculating

correctly, or the data they provided us was calculating correctly, and it was pretty much verifying

the data." (Morgan Dep. at 224:19-1). Plaintiff tested the system to verify that it "calculated the

pension calculations correctly and it ran the necessary reports". (*Id.* at 233:2-4). Plaintiff was

also tasked as a "project manager" of the project and she "managed the resources and the project

scope". (Morgan Dep. at 230). As evidenced in an email exchange, Defendant Palmer appeared

to rely upon Plaintiff's review and her recommendation that the contract reflected previous

discussions regarding the system and Plaintiff recommended that Defendant Palmer sign the

Eepoint System Administration Contract "as is". (Ex. 15, 6/3/2011 email). Plaintiff also

acknowledged that approval regarding the data calculations was needed for "each step" of the

project. (Morgan Dep. at 260).

    4. <u>Vested Lump Sum Program</u>

    In approximately July through August of 2012, Botsford investigated and determined whether to institute a "Lump Sum Distribution" program. (Ex. 19). Doxtader was responsible for investigating the "financial implications" and completing a "financial analysis". (Doxtader Dep. at 89-90). There is no dispute that Plaintiff was not involved in this program's inception or any of the decision-making leading up to its approval. (*Id.* at 90). In September 2012, Plaintiff became involved with the "communication" component of the program and she was tasked with "verification" and "review of the whole communication package". (Palmer Dep. at 146; Morgan Aff. ¶ 62(a)). Plaintiff explained that Towers Watson created the election packet, produced the eligibility list and ran the program. (Morgan Aff. ¶ 62(a)). Plaintiff stated that her responsibility was to upload files to the Wells Fargo system which would result in Wells Fargo making a buyout disbursement. (*Id.*). Plaintiff also received estimates for communications to participants regarding the program which she relayed to Defendant Palmer, Doxtader and others. (Ex. 19). Plaintiff also proofread some of the election kits to make sure they were understandable and determined with Defendant Palmer what the best distribution method for the notice would be - mail or internet. (Morgan Aff. ¶ 62(a)). Additionally, Plaintiff created at least one "project summary" and emailed Botsford's controller Barbara Hrit and Defendant Palmer one status update on the program. (Exs. 21, 22). Finally, Plaintiff responded to any questions from employees regarding the program. (*Id.*).

    5. <u>Parastar Program</u>

    In 2009, Parastar, a company affiliated with Botsford began hiring employees and it was

decided that the company should have a 401(a) Plan. (Parcella Dep. at 41; Morgan Aff. ¶ 62(d)).

Plaintiff was not involved in the decision of whether Parastar should have a Plan or what type of

Plan should be utilized. (*Id.*). At some point, Plaintiff was tasked with making sure that

Parastar's 401(k) Plan "mirrored" Botsford's 401(a) Plan. (*Id.* at 44; Morgan Aff. ¶ 62(d)).

Parcella explained that the plan provisions that needed to mirror one another related to when an

employee would vest under the plan and how many hours an employee must work in order to be

entitled to a contribution. (*Id.*). These provisions were described by Parcella as "objective

criteria". (*Id.*).

## II. STANDARD OF REVIEW

Defendants and Plaintiff have moved for summary judgment under Rule 56(a) of the

Federal Rules of Civil Procedure. This rule provides that summary judgment "should be

rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment

as a matter of law." Summary judgment is appropriate where the moving party demonstrates that

there is no genuine issue of material fact as to the existence of an essential element of the

nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears

the initial responsibility of informing the district court of the basis for its motion, and identifying

those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of

material fact." *Id.* at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that

15

fact "would have [the] effect of establishing or refuting one of the essential elements of a cause

of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th

Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A

dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no

genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th

Cir. 1993). In making this evaluation, the court must examine the evidence and draw all

reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d

1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a

showing that is "sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial" will mandate the entry of summary

judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere

allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in

Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.

FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of

evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of

Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-

moving party must produce more than a scintilla of evidence to survive summary judgment).

### III. ANALYSIS

While the general standard for a motion for summary judgment is set forth above, the

16

parties in this action have filed cross motions for summary judgment regarding the issue of

whether Plaintiff was properly classified as an exempt employee under the Fair Labor Standards

Act ("FLSA"), 29 U.S.C. § 207, *et seq.* "The FLSA lays out a general rule that employees must

be compensated one and one-half times their regular hourly pay for each hour worked in excess

of forty hours per week." *Henry v. Quicken Loans, Inc.*, 698 F.3d 897, 899 (6th Cir. 2012)

(citing 29 U.S.C. § 207(a)(2)).  However, an exemption under this provision exists for

individuals who are "employed in a bona fide executive, administrative, or professional

capacity."[4] 29 U.S.C. § 213(a)(1); *see Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 578 (6th

Cir. 2004).

"The exemptions to the FLSA's overtime provisions are 'to be narrowly construed against

the employers seeking to assert [them].'" *Martin*, 381 F.3d at 578 (citation omitted).

Additionally, "the employer bears not only the burden of proof, but also the burden on each

element of the claimed exemption." *Id.*  The employer must prove "each element by a

preponderance of the evidence." *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 642 (6th Cir.

2013) (citing *Renfro v. Indiana Mich. Power Co. (Renfro II)*, 497 F.3d 573, 575-77 (6th Cir.

2007)).  Accordingly, because the "burden has shifted" the plaintiff is:

> entitled to summary judgment unless the defendant can come forward with
> evidence at least creating a genuine issue of material fact as to whether [the
> plaintiff] meets each and every element of the exemption.  If [the defendant] fails
> to proffer such evidence, not only must its motion for summary judgment be
> denied, but summary judgment for [the plaintiff] must be granted.

*Martin*, 381 F.3d at 578 (citing *Schaefer v. Ind. Mich. Power, Co.*, 358 F.3d 394, 407 (6th Cir.

---

[4] Congress did not define these exemptions but rather delegated authority to the
Department of Labor to "define and delimit" these terms. *Foster v. Nationwide Mut. Ins. Co.*,
710 F.3d 640, 642 (6th Cir. 2013) (citations omitted).

2004) (Suhrheinrich, J., concurring)).  The Sixth Circuit has provided that where questions of

material fact exist as to an element of the administrative exemption analysis, summary judgment

must be denied.  *Foster*, 710 F.3d at 649 (holding "courts cannot make [the determination that a

plaintiff's primary duty does not include the exercise of discretion or independent judgment on

matters of significance] as a matter of law when there are material questions of fact concerning

the work performed and whether it involved discretion and independent judgment." (citing *Henry*

*v. Quicken Loans*, 698 F.3d 897, 901 (6th Cir. 2012)).

    In the present action, Defendants argue that Plaintiff was properly classified as falling

within the "administrative" exemption and that summary judgment is appropriate.  Plaintiff, on

the other hand, argues that Defendants have failed to carry their burden in showing there is a

genuine issue of material fact regarding the elements of the administrative exemption and,

therefore, she is entitled to summary judgment as to liability.

A.    <u>Administrative Exemption</u>

    Under the FLSA, to prove that Plaintiff is employed in a "bona fide administrative

capacity", 29 U.S.C. § 213(a)(1), under the regulations and therefore not entitled to overtime,

Defendants must show that she is an employee:

> (1)    Compensated on a salary or fee basis at a rate of not less than $455 per
>        week .... ;
>
> (2)    Whose primary duty is the performance of office or non-manual work
>        directly related to the management or general business operations of the
>        employer or the employer's customers; and
>
> (3)    Whose primary duty includes the exercise of discretion and independent
>        judgment with respect to matters of significance.

29 C.F.R. § 541.200(a)(1)-(3).

18

In the present action, the parties do not dispute that Plaintiff meets the salary requirement and is paid in excess of $455 per week. (*See* Pl.'s Resp. at 15 n. 5 conceding this element is not at issue). As of 2013, Plaintiff received a salary of $56,201.60 per year which exceeds the $455 per week requirement. (Pl.'s Mot., Ex. A-2, Compensation Summary).

B.    "Office or Non-Manual Work Directly Related to the Management or General Business Operations of the Employer"

The regulations provide that an employee's "primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.201(a)(1). Primary duty means "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "To meet this requirement, an employee must perform work directly related to assisting with the running or the servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Foster*, 710 F.3d at 644 (quoting 29 C.F.R. § 541.201(a)). This has often been referred to as the administrative-production dichotomy "under which production employees (whose job it is to generate the product or service the business offers to the public) will not qualify for the exemption." *Id.* (citing *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 402 (6th Cir. 2004)). However, there are times when the administrative-production dichotomy will not have much value. *See Schaefer* 358 F.3d at 402 (recognizing that the analogy is "only useful to the extent that it is a helpful analogy in the case at hand".).

In the present action, there is no dispute that Plaintiff did not help generate Botsford's product or service (healthcare) to the public. Rather, Plaintiff was a Pension Specialist who provided the "day-to-day administration for five Bostford Pension Plans". (Pl.'s Resp. at 2). As

19

a result, the administrative-production analogy does not have much relevance to the facts at hand.

When the dichotomy is not applicable, courts must then look to whether the plaintiff

performs administrative work. The regulations provide the following guidance:

> [w]ork directly related to management or general business operations includes, but
> is not limited to, work in functional areas such as tax; finance; accounting;
> budgeting; auditing; insurance; quality control; purchasing; procurement;
> advertising; marketing; research; safety and health; personnel management;
> human resources; employee benefits; labor relations ....

29 C.F.R. § 541.201(b).

Plaintiff foregoes any discussion regarding whether her work involved any of the listed

"functional areas" in the Code of Federal Regulations. Rather, Plaintiff contends that Defendants

cannot meet the second prong of the administrative exemption analysis because her "primary

duties were not of substantial importance to management polices or general business operations

of Botsford as a matter of law." (Pl.'s Resp. at 16; *see* Pl.'s Mot. at 17 setting forth a similar

argument). Plaintiff's argument, however, is inapposite to the current FLSA regulations.

Effective August 23, 2004, the regulations regarding defining and delimiting the exemptions

were revised and "streamlined." *See Defining and Delimiting the Exemptions for Executive,*

*Administrative, Professional, Outside Sales and Computer Employees*, 69 FR 22122-01, *22137-

40, 2004 WL 865626 (Apr. 23, 2004).[5]

---

[5]In the commentary to the revisions, the Department of Labor summarized:

> [i]n sum, as in the existing regulations, the final administrative exemption
> regulations establish a two-part inquiry for determining whether an employee
> performs exempt administrative duties. First, what type of work is performed by
> the employee? Is the employee's primary duty the performance of work directly
> related to management or general business operations? Second, what is the level
> or nature of the work performed? Does the employee's primary duty include the
> exercise of discretion and independent judgment with respect to matters of
> significance?

20

In support of her argument, Plaintiff relies upon *Martin*, 381 F.3d 574 (6th Cir. 2004) and

*Rainey v. Am. Forest and Paper Ass'n., Inc.*, 26 F. Supp. 2d 82 (D.D.C. 1998), both of which

analyze 29 C.F.R. § 541.205 - a regulation that no longer exists. In both cases the courts

compared and analyzed a plaintiff's job duties to the now deleted § 541.205.[6]  Indeed, Plaintiff

argues that Defendants must show that her primary duties were of "substantial importance to

management policies or general business operations" while the current regulations provide that

an administratively exempt employee's "primary duty is the performance of office or non-manual

work directly related to the management or general business operations of the employer or the

employer's customers". 29 C.F.R. § 541.201(a)(2). Plaintiff appears to be importing the

"substantial importance" argument from the third prong of the administrative exemption analysis

that requires that an exempt employee's "primary duty includes the exercise of discretion and

independent judgment with *respect to matters of significance*." 29 C.F.R. § 541.201(a)(3)

(emphasis added).

    The DOL comments to the 2004 revisions clarify and highlight Plaintiff's

---

*Id.*, at *22144.

    [6] Section 541.205(a) provided that "[t]he phrase 'directly related to management policies or general business operations of his employer or his employer's customers' describes those types of activities relating to the administrative operations of a business as distinguished from "production" ... In addition to describing the type of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers."
    Section 541.205(b) provided: "The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for, example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control ...".
    Section 541.205(c) read, in relevant part that work that is of substantial importance "is not limited to persons who participate in the formulation of management polices or in the operations of the business as a whole," but includes employees whose work "affects policy or whose responsibility it is to execute or carry it out."

21

misapprehension of the current regulations by making clear that the factors previously set forth in section § 541.205 and § 541.207 have been incorporated into the revised § 541.202. This fact suggests that these factors are more relevant to the third element of the administrative exemption analysis (whether an employee exercises "discretion and independent judgment") rather than the second element (whether an employee's work is "directly related to management or general business operations"). *See* 69 FR 22122-01, at * 22142-43 (noting that the factors and certain language from §§ 541.205 and 541.207 were included in the revised § 541.202); *see also Lutz v. Huntington Bancshares, Inc.*, No. 2:12-cv-01091, 2014 WL 2890170, *10 n. 9 (S.D. Ohio, June 25, 2014) (observing and explaining the same).

Plaintiff has therefore failed to address or distinguish the relevant standards and case law.[7] As a result, Plaintiff has failed to show that there is any material issue of genuine fact regarding whether her primary duties were "directly related to management or general business operations." Indeed, Plaintiff testified at her deposition that "120%" of her time was spent on her pension specialist duties which included: "Application of compliance matters", "Provid[ing] pension calculations/counseling"; "Maintain[ing] retiree database"; "Handl[ing] all telephone, written inquiries, and requests". (Defs.' Br. Ex. 2, Resume; Ex. 3, Morgan Dep. at 311). These tasks all can be easily analogized to employee benefit functions or human resource functions.

---

[7] Plaintiff also relies upon a DOL position letter which found that a background investigator for the Department of Defense was not an administratively exempt employee. (Pl.'s Ex. L). This letter references the revised regulations and does conclude that the activities of the investigators were more related to the ongoing, day-to-day investigative services, rather than performing administrative functions directly related to managing your client's business." (*Id.* at 4). There is little or no analysis regarding this conclusion, however, the letter does go on to offer a more in-depth analysis of why the investigator's work failed to meet the third prong of the administrative exemption analysis. (*Id.* at 4-5). Therefore, while the DOL letter may be relevant, it is not relevant to Plaintiff's argument regarding the second prong of the administrative exemption analysis as set forth in the current regulations.

Therefore, Defendants shown there is no genuine issue of material fact regarding whether Plaintiff's primary duties were directly related to the management or general business operations of Defendant Botsford.

C.      "Exercise of Discretion and Independent Judgment with Respect to Matters of Significance"

The third prong of the administrative exemption rule sets forth that an employee employed in a bona fide administrative capacity is one whose "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3).

A primary duty is "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). When determining what a plaintiff's primary duty is, a court must "focus on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions, and performance evaluations." *See Schaefer*, 358 F.3d at 400 (citing *Ale v. Tenn. Valley Auth.*, 269 F.3d 680, 688-89 (6th Cir. 2001)). Further, a job description, even if authored by an employee, is not dispositive of his or her day-to-day job duties when those duties are disputed by the employee. *Id.* at 400-01. Rather, the inconsistencies "merely raise credibility questions for the fact-finder." *Id.* at 401.

As to the exercise of discretion and independent judgment, the regulations further clarify that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). "The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques,

23

procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e).

"The term 'matters of significance' refers to the level of importance or consequence of the work

performed."[8] 29 C.F.R. § 541.202(a). The regulations also provide a number of "factors to

consider" when evaluating whether an employee exercises discretion and independent judgment

in matters of significance including: "whether the employee has authority to formulate, affect,

interpret, or implement management policies or operating practices ... whether the employee has

authority to commit the employer in matters that have significant financial impact; whether the

employee has authority to waive or deviate from established policies and procedures without

prior approval; .... whether the employee investigates and resolves matters of significance on

behalf of management..." 29 C.F.R. § 541.202(b).

Certain factors, however, do not bear on whether an employee exercises discretion and

independent judgment under § 541.200(a)(3). "An employee does not exercise discretion and

independent judgment with respect to matters of significance merely because the employer will

experience financial losses if an employee fails to perform the job properly." 29 C.F.R. §

541.202(f). Further, an employee can exercise discretion and independent judgment "even if

their decision or recommendations are reviewed at a higher level" and such action "may consist

of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c).

1.      Well-Defined Prescribed Procedures

In this action, Plaintiff argues that Defendants cannot carry their burden and show that her

primary duties included the exercise of discretion and independent judgment with respect to

---

[8] The Court does not address whether Plaintiff performed work on matters of significance because Plaintiff freely admitted in her deposition that her work was important to Botsford. (Morgan Dep. at 109:12-14).

matters of significance because Defendants confuse "discretion and independent judgment" with the use of skill in applying well-established techniques or procedures. 29 C.F.R. § 541.202(e). More particularly, Plaintiff claims that she did not exercise discretion or independent judgment as a Pension Specialist because her decisions were dictated by the Plan documents and guidelines, and her primary day-to-day duties concerned collecting and evaluating objective facts such as dates of birth and hiring dates or answering questions regarding Plan documents.

"To determine whether an employee, constrained by guidelines and procedures, actually exercises any discretion or independent judgment, [the court] consider[s] whether those guidelines and procedures contemplate independent judgment calls or allow for deviations." *Renfro v. Ind. Mich. Power Co.* (*Renfro II*), 497 F.3d 573, 577 (6th Cir. 2007) (internal citations omitted).

2. Decisions regarding Employees in the Employee Benefits Field

Defendants argue that they have met their burden in showing that Plaintiff's primary job duties involved the use of discretion and independent judgment and rely primarily upon two nonbinding cases in support of their argument. The Court addresses both of these cases in turn.

In *Furlong v. Johnson Controls World Services*, 97 F. Supp. 2d 1312 (S.D. FL 2000) the court found as a matter of law that the plaintiff, a "senior benefits analyst", was properly classified as being administratively exempt and was not entitled to overtime compensation. In making its determination that the plaintiff was an exempt employee, the court summarized his "primary duties" noting that his duties consisted of: "analyzing plan designs and benefits procedural or system changes; making appropriate recommendations"; "conducting plan audits to ensure compliance"; "developing cost/benefit analysis of various plan design changes and

25

preparing reports and recommendation based on findings"; "developing and maintaining a standard administrative manual for all benefit programs"; "administering local network of doctors, hospital and support services"; "coordinating customer satisfaction surveys for benefits and related products and making recommendations"; reviewing and revising benefit materials; communicating benefit updates and changes to employees; "assisting in developing and providing training on benefits programs and procedures". *Id.* at 1312. The court went on to find that the plaintiff had failed to set forth any evidence (through affidavit, testimony or otherwise) to corroborate his conclusory statement that a question of fact existed as to whether he actually performed the aforementioned primary duties or whether those duties described involved discretion or independent judgment. Accordingly, the court held that plaintiff's work as a "senior benefits analyst" required him to "routinely exercise discretion and independent judgment in analyzing plans, changes, and designs." *Id.* at 1316.

The Court finds that *Furlong* is factually distinguishable from the present case. First, in the present case Plaintiff has adequately set forth evidence that raises material issues of fact regarding exactly what her primary day-to-day duties were as a Pension Specialist and also whether those duties required her to use independent judgment and discretion as required under the regulations. Additionally, the senior benefits analyst in *Furlong* was engaged in actually analyzing and actively designing the benefit plans in question.

Moreover, while some of the duties described in *Furlong* overlap with those performed by Plaintiff as a Pension Specialist, specifically training and providing information to employees regarding plans, communicating changes to employees and reviewing and revising the benefit materials, the bulk of the job duties described are distinguishable. Plaintiff was not involved in

26

plan design, nor did she, herself, have the ability to change or deviate from the terms or requirements of the Plan.  There is also no evidence that Plaintiff ever advocated or recommended a substantive change to the Plan.  Plaintiff also did not conduct audits of the plans for compliance, but rather merely supplied the information the auditors sought.  Plaintiff also never created a manual regarding the Botsford Plans but was merely was in charge of retaining the "kits" and other materials that the Vendors created and supplied to Botsford.  Plaintiff's job, when viewed holistically, was as a specialist in the area of knowledge regarding the Plan terms and requirements such that she could relay this information to participants, coworkers and even at times Vendors.

Defendants also rely upon *Copas v. East Bay Municipal Utility District*, 61 F. Supp. 2d 1017 (N.D. Cal. 1999).  In *Copas*, the court analyzed whether Charles G. Sharick ("Sharick"), employed as a "Personnel Analyst III", was properly classified as administratively exempt.  *Id.* at 1033.  Sharick reported to Larry Yok ("Yok"), the Secretary of the Retirement Board who was also the Manager of the district's personnel department.  *Id.*  The Retirement Board was "responsible for creating and implementing the policy of [the district's] Employee Retirement System ("ERS")" and Yok was ultimately responsible for administration of ERS.  *Id.*  Sharick also reported for a time to John Hill ("Hill"), who was the Manager of Employment (who in turn reported to Yok).  *Id.* at 1033-34.

Sharick testified that his primary duty was to assist Yok and Hill in the administration of the ERS.  *Id.* at 1034.  Sharick was also responsible for determining whether employees were eligible for a low-income adjustment and what amount the retiree should receive.  *Id.*  Sharick helped determine the amount of the annual cost of living adjustment for retirees, however, most

27

of Sharick's work was subject to approval by his superiors. *Id.* Notably, Sharick also did research and gathered information that formed the basis of his superiors' memos on the subject of modifying Retirement Board rules and amending Retirement Ordinance. *Id.* Sharick also "compiled a desk manual documenting all of his job duties and procedures with regard" to the Retirement system. *Id.*

Critically, for the majority of the time in question Sharick "performed most of the duties of the Retirement System Administrator" (which was an unfilled position at that time). *Id.* at 1035. Indeed, Sharick testified that one of his tasks before he retired was to "provide an orderly transfer of duties from himself" to the new administrator of the plan. *Id.* The new administrator, Hill, also testified that Sharick helped him perform his "new duties" as administrator which included "drafting, analyzing, and recommending legislation for review of the Retirement Board and approval by the District's board of directors"; helping to choose the providers of professional services (*i.e.* banking, actuarial and investment management); preparing and reviewing enrollment and counseling employees on the system; and managing "special studies" relating to the administration of the fund. *Id.*

The *Copas* court found that Sharick had exercised discretion and independent judgment with respect to matters of significance despite being "obligated to act in conformance with applicable rules and regulations" and that his job was more than "the performance of routine clerical duties". *Id.* at 1036. The court noted that Sharick prepared memos that resulted in board resolutions, he "salvaged the employee suggestion system", his salary was 50% higher than that of the employee who provided him clerical support, and that his drafting of a manual reflecting his job duties was "plainly" an exercise of discretion. *Id.*

28

The Court finds that *Copas*, similar to *Furlong*, is factually distinguishable from the present case. While there is some arguable overlap in the duties Plaintiff performed as Pension Specialist and the duties that Sharick performed, including communicating with employees regarding the retirement system and determining eligibility of employees under the Plans, there are several relevant factual distinctions that blunt Defendants' argument that *Copas* is persuasive. First, Sharick appears to have been acting as the administrator of the Retirement System for the majority of the time at issue. This is made clear by the fact that many of his discretionary duties related to those "new" duties that Hill performed when appointed as administrator. *Id.* at 1035. These duties involved "drafting, analyzing and recommending legislation" to the Board and his involvement in choosing the banking, and investment management services for the retirement trust fund. In the instant action, Plaintiff was not involved in the drafting or analyzing of the Plans such that she recommended or implemented Plan changes. Rather, Plaintiff's recommendations were directed at the form of the notices and the vehicle of communication (mailings vs. email notifications). Further, while Plaintiff asked for quotes from Vendors regarding discrete issues such as the Eepoint software, she did not negotiate the prices for those services nor did she define the scope of the contracts. At most she was in charge of verifying that the program would follow the Plan's calculations.

Additionally, Sharick was provided with clerical support and was paid 50% more than the person who provided him that support. In this action, Plaintiff was neither the administrator to any Plan, management, or a supervisor, nor was she ever provided any clerical or staff support. Indeed, Plaintiff's compensation reflects this status, as she was paid at least $100,000 less than that of Defendant Palmer (the actual Administrator to the Plans) and Plaintiff was also paid 50%

29

less than Ms. Seybert who determined employees exempt status and compensation. (Seybert Dep. at 12, 19). Finally, unlike the present case, there is nothing indicating that Sharick's employer had contracted with third-party administrators and consultants regarding the administration of the Plans.

For all these reasons, the Court finds that *Copas* and *Furlong* are distinguishable on their facts and not persuasive.

### 3. Sixth Circuit Case Law and the Relevant Regulations

Here, Plaintiff had some 25 years of experience in the field of pension plans. It is undisputed that she was extremely competent at her job and was the "go-to" person for any question relating to the terms of the Plans at Botsford. (Parcella Dep. at 76). She was indeed a "subject matter expert". (Palmer Dep. at 72). However, in *Schaefer*, the Sixth Circuit made clear that "the mere fact that [a plaintiff] has extensive knowledge of the regulations" is not sufficient "to turn their application into exercises [of] discretion and independent judgment." *Schaefer*, 358 F.3d at 405 (citation to previous 29 C.F.R. § 541.207(c)(3)). Plaintiff's knowledge of the Plan provisions and her ability to answer her superiors' questions regarding these Plans does not *ipso facto* transform her "advice" into an act of discretion or independent judgment. Plaintiff has submitted that the majority of her time was spent with Plan participants going over Plan specifics and helping them fill out forms and entering their personal data into the requisite website to begin the disbursement. Plaintiff has also attested that she spent much of her time verifying and entering objective facts such as birth dates, death dates, and termination dates into a computer system. She also answered questions regarding the requirements of the Plans from participants and colleagues. Plaintiff made abundantly clear in her deposition testimony

30

that the Plan language could be "very ambiguous" however contrary to Defendants' assertion that

she interpreted those tricky provisions or resolved issues of ambiguity herself, Plaintiff testified

that:

> [s]ometimes they're very ambiguous, and I'm not an attorney, and sometimes they
> were written – I have a good knowledge and understanding of the plan document
> because I have been looking at it for 15 years, but things that I was not sure on
> then I would go through our third-party administrator for clarification.

(Morgan Dep. at 43:9-15). Indeed, it is clear that in addition to the Plan Documents, IRS and

ERISA regulations that dictated the procedures that Plaintiff had to follow, Plaintiff's discretion

and independent judgment regarding Plan interpretations was further diminished by the fact that

Botsford used a host of third-party administrators, legal counsel, and consultants to administer

the Plans. Therefore, it appears from Plaintiff's testimony and evidence in the record that

frequently when she was asked a question whose answer was not in the Plan or was not easily

ascertainable from the Plan Documents she contacted one of these Vendors. Defendants construe

Plaintiff's request for "expert outside review" regarding issues with the Plans as evidence of

discretion and independent judgment. (Def.'s Mot. at 12). The Court finds that it indicates a

lack of the same, because it illustrates a lack of authority or ability to make those decisions.

It does appear from the record that Plaintiff used discretion and independent judgment in

relation to her oversight of the Eepoint software project where Defendant Palmer asked for her

recommendations on vendors and for her approval of the contract. However, Plaintiff disputes

that this was one of her primary duties as it was a discreet project. Similarly, Defendant points

to many discrete situations or emails in which Plaintiff recommended a solution or requested that

a default not be processed as evidence that Plaintiff utilized discretion and independent

judgment. Defendant relies exclusively on Plaintiff's job description to support its argument.

31

(*See* Ex. 51, 56). Plaintiff disputes that these individual emails or singular actions can amount to a primary job duty.

Moreover, from careful review it appears that many of the Defendants' examples of Plaintiff employing independent judgment and discretion are misleading. Indeed, Plaintiff's involvement in Plan audits and the Parastar project are examples of relaying or providing information and requirements from the Plans; Plaintiff's involvement in enrollment and benefit calculations involved only the verification of objective facts (when you can retire, when do you vest, etc.) rather than discretionary advice regarding investments or different possible courses of conduct (which Plan to enroll in, how much money and where to invest). Also, Defendants contend Plaintiff was using independent judgment and discretion when she sought opinions from Vendors or legal counsel regarding an issue because such an action was constituted a discretionary "investigation". However, as noted previously, such requests for third-party opinions are better categorized as an acknowledgment that the answer was not in the Plan documents and Plaintiff was without the authority or knowledge to propose a solution (*see* Exs. 50, 52). Finally, despite Defendants' representations, Plaintiff's "approval" of Vendor invoices consisted of verifying the work was actually done but she did not have signing authority (except during a discreet time period when her supervisor was on medical leave).

The Sixth Circuit has cautioned that "[i]t is not enough to merely latch on to words like 'decision,' 'recommendation,' 'judgment,' or 'determine' in the procedures and in [plaintiff's] deposition testimony." *Schaefer*, 358 F.3d at 405 (citing *Ale*, 269 F.3d at 691 (noting that "[t]he words 'in charge' are not a magical incantation that render an employee a *bona fide* executive regardless of his actual duties.")). Moreover, the courts are directed to concentrate on an

employee's day-to-day duties in determining whether a job duty is a primary one. *Id.*

Finally, this action is distinguishable from *Renfro II* where the Sixth Circuit determined that technical writers were not simply applying skills or following a manual but were exercising discretion and independent judgment in their primary duties. *Renfro II*, 497 F.3d at 577. In *Renfro II*, the Sixth Circuit observed that "[t]he manual provides a guideline on how to develop a procedure, not an encyclopedia of strict requirement. It does not answer substantive questions that might arise during the research, analysis, and development of a procedure; nor does it restrict the technical content of the instructions that are formatted by the general template." *Renfro II*, 497 F.3d at 577. The manual at issue in *Renfro II* merely ensured "uniformity of the style and format of the technical writers' procedures, but not their content." *Id.* In the present action, Plaintiff followed the Plan documents which for all intents and purposes were an "encyclopedia of strict requirement" and when faced with a decision that was not provided for - Plaintiff testified that she would ask for an opinion and guidance from Botsford's third-party administrators and consultants. Defendants have not evidenced that Plaintiff herself was in charge of any Plan design or even that she ever recommended a substantive change to a Plan by recommendation. Rather, the testimony established that Plaintiff was a subject matter expert and was extremely knowledgeable regarding the requirements set forth in the Plans.

In *Schaefer*, the Sixth Circuit found there were genuine issues of material fact regarding whether the plaintiff exercised discretion and independent judgment with respect to his job as an environmental specialist at a nuclear power plant. 358 F.3d 394 (6th Cir. 2004). In *Schaefer*, the plaintiff argued that many of his tasks were heavily regulated by numerous sources (including DOT regulations, Nuclear Regulatory Commission regulations, and state regulations). The Sixth

33

Circuit noted that "the very purpose of such detailed regulations and procedures is to create conformity which has the practical effect of minimizing discretion." *Id.* at 404. Here, Plaintiff was similarly subject to heavy regulation whose purpose is to minimize or even eliminate discretion. Where Plaintiff and Defendants disagree as to what exactly Plaintiff's day to day duties were and the extent of the discretion and independent judgment those duties required, a genuine issue of material fact exists that is inappropriate to resolve at the summary judgment stage. *See Id.* at 407 (Suhrheinrich, J., concurring) ("The decision of whether an employee is exempt from the FLSA's overtime compensation provisions" is "primarily a fact question."); *see also Quicken Loans*, 698 F.3d at 901(recognizing issue of fact); *see also Foster*, 710 F.3d at 649 (noting same).

D.     Ability to Prove Overtime Worked

       Finally, Defendants argue that Plaintiff has failed to establish that she worked more than forty hours in a work week and was entitled to overtime wages. Defendants contend that it is Plaintiff's burden to set forth admissible evidence that in a given workweek, she worked more than forty hours and was not paid at a rate of one and one-half times the regular rate. (Defs.' Mot. at 25; Defs.' Reply at 5-6; ECF No. 71, Defs.' Supp. Authority).

       It is well settled that to establish liability under the FLSA, a plaintiff "must prove by a preponderance of evidence that he or she 'performed work for which he [or she] was not properly compensated.'" *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 602 (6th Cir. 2009) (citing *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999)). The Supreme Court explained the employee's burden in this regard:

       [w]hen the employer has kept proper and accurate records the employee may
       easily discharge his burden by securing the production of those records. But

34

> where the employer's records are inaccurate or inadequate and the employee
> cannot offer convincing substitutes a more difficult problem arises. The solution,
> however, is not to penalize the employee by denying him any recovery on the
> ground that he is unable to prove the precise extent of uncompensated work .... In
> such a situation we hold that an employee has carried his burden if he proves that
> he has in fact performed work for which he was improperly compensated and if he
> produces sufficient evidence to show the amount and extent of that work as a
> mater of just and reasonable inference.

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded by statute on other*

*grounds*, Portal-to-Portal Act of 1947, Pub. L. No. 80-49 §4(a), 61 Stat. 86-87 (codified at 29

U.S.C. § 254(a)), *as recognized in Integrity Staffing Solutions, Inc. v. Busk*, 135 S.Ct. 513, 516-

17 (2014). The Sixth Circuit has explained that

> to determine the extent of damages the plaintiff can "prove his or her 'under-
> compensation' damages through discovery and analysis of the employer's code-
> mandated records. However, if the employer kept inaccurate or inadequate
> records, the plaintiff's burden of proof is relaxed, and upon satisfaction of that
> relaxed burden, the onus shifts to the employer to negate the employee's
> inferential damage estimate."

*O'Brien*, 575 F.3d at 602 (citation omitted). It is clear, however, that this "relaxed" burden of

proof does not help a plaintiff establish *liability* under FLSA, it merely relaxes the burden in

evidencing damages after liability is established. *Id.*

In the instant case, Plaintiff submits that she has produced at least enough evidence to

establish a just and reasonable inference that she worked more than forty hours per week.

Plaintiff testified that she often worked through lunches, came in early, worked late and took

work home with her. (Morgan Dep. at 295-97; Pl.'s Aff. ¶ 63). Plaintiff also attested that she

can estimate the time she spent on her job duties and calculate the overtime she worked based on

spreadsheets she created as part of her job that reflect the job duties and tasks she was working

during each year, and has submitted her hourly estimate based on those spreadsheets by breaking

35

down the hours she spent on each job duty or task. (Morgan Aff. ¶ 62(ii), Moran Aff. Ex. 11, 12; Pl.'s Resp. Ex. 26). Plaintiff also relied upon her personal calendar to determine the number of employee meetings she had each day. (*Id.*).

Plaintiff also noted that after the Eepoint System was put in place, Defendant Palmer directed that Plaintiff take on Human Resource duties in addition to her normal duties because Defendant Palmer believed that Plaintiff's Pension Specialist duties would have decreased. (Pl.'s Mot. Ex. K, Watson Dep. at 18-29; Morgan Aff. ¶¶ 62,63). However, the human resource supervisor, Dalph Watson, testified that after a period of time Plaintiff complained to her that she was having problems accomplishing both her new human resource job duties and her Pension Specialist job duties. (Watson Dep. at 18-23). Plaintiff supplied Watson with a description of her other job duties and Watson testified that she had not realized that Plaintiff had so many other job duties. (Watson Dep. at 18-20). Watson then spoke with Defendant Palmer who indicated that Plaintiff's job duties had changed in light of the institution of the EePoint system and Plaintiff should still be able to take on the added human resource functions. (*Id.* at 20-21, 24-25). Watson testified that Plaintiff disagreed with Defendant Palmer's assessment, however, she continued to do both job functions. (*Id.*). Ultimately, Watson took the human resource duties away from Plaintiff after it was confirmed that the other woman assigned to split the human resource work had been surreptitiously delegating her work to Plaintiff rather than doing it herself. (*Id.* at 27-29). Plaintiff argues that these facts further support her testimony that she was working more than forty hours per week and that she was contemporaneously bringing her concerns to the attention of Defendants.

Defendants argue Plaintiff has failed to set forth detailed weekly records that evidence the

hours she worked and argue that Plaintiff's summary of the hours she worked based upon her work spreadsheets are "self-serving" and cannot create an inference that she worked overtime hours. Defendants appear to argue that Plaintiff must provide evidence, beyond her own testimony, that she worked more than 40 hours per week in a particular week. (*See* Defs.' Reply at 5-6; Defs.' Supp. Auth.).

Defendants' arguments are unavailing. The Sixth Circuit recently spoke to this issue and reversed one of Defendants' cited authorities in *Moran v. Al Basit, LLC*, (*Moran II*), No. 14-2335, --- F.3d. --- , 2015 WL 3448655 (6th Cir. June 1, 2015). The district court had previously granted summary judgment to the employer defendants in an FLSA action where the defendants had submitted paystubs and timesheets evidencing that the plaintiff did not work over 30 hours per week and the plaintiff relied upon his own testimony to evidenced that he worked more than 40 hours per week and dispute the veracity of the defendants' timesheets. *See Moran v. Al Basit, LLC*, (*Moran I*), No. 13-13625, 2014 WL 4206961, *2, (E.D. Mich. Aug. 25, 2014). The Sixth Circuit, however, held that a plaintiff's testimony alone may defeat a defendant's motion for summary judgment. *See Moran II*, at * 7. The Sixth Circuit explained that

> Plaintiff's testimony coherently describes his weekly work schedule, including typical daily start and end times which he used to estimate a standard work week of sixty-five to sixty-eight hours... [and] we do not require employees to recall their schedules with perfect accuracy in order to survive a motion for summary judgment. It is unsurprising, and in fact expected, that an employee would have difficulty recalling the exact hour he left work on a specific day months or years ago. It is after all, "the employer who has the duty under § 11(c) of the [FLSA] to keep proper records of wages [and] hours," and "[e]mployees seldom keep such records themselves."

*Id.* (quoting *Anderson*, 328 U.S. at 687). The Sixth Circuit ultimately concluded that "[d]espite the lack of corroborating evidence, Plaintiff's testimony is sufficient to create a genuine issue of

material fact that forecloses summary judgment at this juncture." *Id.* at *7.

 *Moran II* is dispositive of the issue presented here, because in the instant case Plaintiff has submitted *more* than her testimony to support the inference that she worked more than forty hours per week. Indeed, she has provided a detailed estimate that breaks down the number of hours she worked based on spreadsheets she created as part of her job duties that contemporaneously reflected the tasks that she was working on during each year at issue. Plaintiff has also submitted deposition testimony of the human resource supervisor who corroborated that for at least five or six months Plaintiff was accomplishing her regular tasks as well as human resource job duties and that she complained multiple times that she could not get the all of the work done. Moreover, Defendants have offered no deposition testimony, affidavit or other record-keeping evidence that contradicts Plaintiff's testimony or other evidence. Finally, the Court notes that Defendants arguments are more accurately directed at the credibility of Plaintiff as a witness rather than whether Plaintiff has carried her burden to evidence that she worked more than 40 hours per week as a just and reasonable inference.

 Accordingly, the Court finds that Defendants' argument is without merit and Plaintiff has established by a just and reasonable inference that she performed work for which she was not properly compensated as required under the FLSA.

IV. CONCLUSION

For all these reasons, the Court DENIES Defendants' Motion for Summary Judgment

(ECF No. 45) and DENIES Plaintiff's Partial Motion for Summary Judgment (ECF No. 50).

      IT IS SO ORDERED.

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:      **JUN 0 5 2015**

39